The Court's decision to affirm three significant components of the Department of Commerce's calculation of the normal value of wind powers exported by CSW. Each of these decisions is equally important to our client. Each has a relatively equal impact on CSW's dumping margin. Unless the Court asks me to focus on one or two of these issues, I plan to spend my time summarizing the linchpin of our argument for all three issues. First, weight, FOP or PACT. Second, valuation of flanges, market price or surrogate value. Can I ask you about the weight issue to tell you how I understand it? And I'm going to ask you whether there's one number that I can say aloud because it makes things more concrete. My understanding of the weight issue is this, that Commerce gave one reason for the verified component weight and that is that the packing weight was essentially a doubling of the reported weight. And the problem with that is that the doubling was as to a subgroup of components that represent, may I say the percentage? You may, Your Honor. Okay. About 8% of the total so that the actual disparity in weight is about 3.6%. And there's no reason to think that a 3.6% difference in weight affects the tippiness of the shipping even if one of the ship, even if a doubling would. And that makes the basis of their decision unsound. Yes, Your Honor. The 3.6% and that's approximate in our opinion. They say it's significant. I'm not sure if they say it's significant or not, but that's not significant. Well, they don't say in their brief that it's significant and I didn't see it. We don't believe in their opinion they said it's significant. They said there's a difference. There's a total difference of 3.6%. Well, that's the only difference. Why is this equivalent to your client? You said all of these issues matter all. All the issues as far as the margin is concerned, Your Honor. We have three issues that impact our final dumping margin. So even though we're now talking about 3.6%, that has a dramatic impact on the ultimate? Yes, Your Honor. Each of these issues has a dramatic impact on the ultimate dumping margin. Just to be clear, the 3.6% is the difference in weight and it makes about a 15% difference in your margin? Probably less than 15%. Right now, we're at a 17% margin. If we win two out of three issues, we have a zero margin. And each of these issues has approximately the same impact on our ultimate margin. So this issue is, let's say, approximately 8%. The other two issues are approximately 8%. If we win two out of three, we have a zero margin, which is the minimus, and we will be excluded from the dumping order. But the 3.6% is the difference in weight between the packed weight, which the Department of Commerce agreed was an estimated weight, which we told them it was an estimated weight at the beginning of this investigation. And that's the difference between that packed weight and the actual verified weight. If you look at the verification report and you look at the briefs by the Department of Justice, they agree that the actual weights of these internal components was verified by the Department. And if the actual weights are verified by the Department, and that means we gave them all the information, there's nothing more we could have given them because they verified the facts. When you say they verified, they didn't actually put all these components on a scale, right? Correct. They did not put the components on the scale. But the Department of Commerce verification procedures, they were in Vietnam, they were in Korea for a week, and they were in Vietnam for the week. They looked at all our records. And if you look at the report, they verified that the weights that we presented to them for these internal components were accurate. And that is part of their findings. And that's part of their verification report. Now, that would be like a post hoc decision. Oh, we didn't verify them because we didn't put them on a scale. They had, they could do what they, in verification, they had a choice. Potentially they could have put them on the scale. But based on how they verified and were taking their verification report as accurate and supported by substantial evidence to record, because it's in the report, they found that our weights were accurate. We gave them a full, a list of all the weights. Can you identify who it is that's calculating and determining the packed weight and what it is, what are the steps they go through to calculate the packed weight? The packed weight is an estimate provided to our client by their customer and it's used  So who is creating the packed weight? The customer gives the packed weight to our, this is under record also, gives the packed weight to CSW and CSW puts the packed weight of the entire tower, the plate, the flanges, all these internal components. And what do we know about what the customer does in terms of calculating the packed weight? Very little. We know that they know the approximate weights of all the components, the This is what we believe the packed, the weight of the entire section of these massive Where do they get those approximate numbers? They know the weight from documents, from the documentation at a steel plate. If a steel plate is of this size, it weighs this much. They know how many steel plates go into a wind tower section. They know how many flanges in the wind tower sections for internals. They know these are the internals and the internals are much more approximate because they don't really weigh the internals. I say the internals, that would be a junction box or rubber gasket. They don't weigh them. They say, well, we think these are approximately weigh this much. They put it together and they give a unitary amount to our client. They say, this is the packed weight. It's a final complete weight. Everybody agrees. And the Department of Commerce confirmed that this is an estimate. They agree it's an estimate. They have an interest, though, in making sure that the weight is as close to accurate as possible in terms of shipping and shipping safety. Absolutely. And the difference between our accurate, verified weights for the plates, for the flanges, for the components was really less than 4%, about 3.6%, which is a very small amount. And for shipping safety, that's enough. Commerce says, well, shipping safety is important, but nobody says that. Somehow it wasn't safe because it's a 3%, 3.6% difference. Commerce didn't make that determination. What Commerce did was they accepted a weight that they knew was estimated, they knew not was accurate, and they rejected weights that the Department of Commerce, using their traditional normal verification procedures, verified as being accurate. Okay. I was just going to suggest we move on to another issue. Yeah. Can I ask you to move to issue number three? Number three before number three. To put it mildly is the most confusing of the issues. And I want to start with this. Is there any information on the face of the Ganges, or findings or concessions or anything like that, on the face of the Ganges Annual Report, which is what we're staring at here, that indicates that the erection and civil expenses, which is something that Ganges paid other people for, corresponds to the erection and civil income, which is something that Ganges receives. Are they the same towers or not the same towers, or do we just not know? We don't know on the record. So if we don't know, then why is it, this is just one part of it, why is it not permissible for Commerce to say, it would be plausible that Ganges outsources the foundation creation and the erection of everything, because it's not going to send a bunch of employees over, and it pays a certain amount to the subcontractors to do that, that's on the charges side, and then it adds a general contractor markup, and it gets money from the customer, Siemens or West Virginia Electric Power Company or something. And those would correspond, but we don't know that. So it could be that those are completely unrelated, and we therefore do not have to do your preferred simple thing, which is subtract the 142 billion rupees from the job work charges, from the 212. And so it's legitimate for us to try something else, and then it gets complicated. First, what we're saying is that as a matter of Department of Commerce policy, when you have something in the financial statement, job work charges, including erection and civil expenses, if you have an expense, Department of Commerce traditional policy is to reduce that by income of the same type of income in the financial statement. So here you have a word, job work charges, erection, and civil expenses, so Department of Commerce policy is to say, okay, we're going to reduce that by the income, because it relates, the income relates to the expense. Not the exact same expense, but relates overall to erection expenses, civil expenses, job work expenses, relates to job work income, civil income, and erection income. So that's their traditional policy, even though it may not be the exact same job, that if you have an expense, and you have income, the income reduces the expense on the financial statement to get the overall expense, because they realize income from income associated with performing job work. Right, but I mean, I understand that if there's a reason to think that they are, or a good enough reason to think that they're substantively related, but if they're just related at the level of name, that's probably not enough. In the way that job work charges and job work income are almost certainly completely unrelated in substance. One is manufacturing that Ganges is doing for somebody else, and the other is manufacturing that Ganges is paying somebody else to do. Completely different jobs. Yes, they're completely different jobs, but the policy, the Department of Commerce policy, the policy they used in this case is that they took the job work income, remember, they used it, they deducted the job work expense by the job work income. They agreed with that. They took the job work income and deducted that from the expense. You don't challenge that, but it seemed to me, I guess I don't understand why they could do that, but on the other hand, it's like 2 cents, so why would anybody care about it? It's like 2 million or something out of 1 point something billion. It's so trivial. Why would anybody fight about it? Is there anything actually rational about including the job work income in the ratios that come later? Well, what's rational in the Department of Commerce, their policy is if you have an expense and you have an associated income on the same name, the financial statement, we really don't have much information. The policy is to reduce the expense by the income associated with the same name. I thought Commerce said they have another policy which says when you have something like civil income and erection income, they'll treat those things as separate lines of business. So that's what they did here. But the question, I mean, they have, I think if you look, it's not a separate line of business, and there if you look at the financial statement and if you look at what we talk about in the brief, it's the same general operations of the company. The civil income and the erection income are part of the general operation of the company. Ganges conducts the erection and the civil income the same way it produces the wind towers, and there it is part of the general operations of the company. And there we think there's a mistake. It's not their policy to treat it differently. When you look at the four corners of the financial statement, you see it's part of their operating income and it's part of their expenses. The expense line says it's job or charges including erection and civil expenses. So it's part of the general operations. And if it's part of the general operations for the expense side, it's part of the general operations for the income side. So to be consistent and to just take a reasonable, consistent view of the financial statement, if you have expenses of a certain amount including erection and civil, you also should deduct the income with the same names. Otherwise, we believe the Commerce really tried to look behind the financial statement and they developed a methodology that we had a very difficult time understanding and probably did not do a good job of explaining to you because it was so convoluted. They just went around in circles. Do you want to quickly identify the other alleged errors you have on Issue 3? Issue 3, we believe the big error is that they should have used the first methodology, the simple methodology rather than the convoluted methodology. And also when you use the convoluted methodology, you have just a total disconnect where you have income of this $144,000 and the expense is only the job work expenses. So their calculation of their job work expenses is very small when it should have been equal because you're starting with expenses of $212,000 and income of $144,000. What they end up is with very, very high expenses of about $180,000 and a very, very small income because they're throwing out all this civil income and election income because they somehow believe they've calculated it's associated with something else. And it just doesn't make sense the way they get to that. The roundabout way they get to that doesn't work because they make a fundamental mistake by when they include in the sale of finished goods, they somehow say that that's associated with job work income. Job work income has nothing to do with sale of finished goods. The income is when somebody else sells the finished goods. So really they're fundamental mistakes and commerce acted in a way that just didn't make sense. Based on their original presumption that when you have an expense, you should, based on the four corners of the statement, you deduct the income with the same names. I don't know if I have time to get to... You've already exhausted your rebuttal time. So why don't we hear from the Governor before we move on. Thank you. Mr. Kerlin. Good morning, Your Honors, and may it please the Court. This case involves several instances in which commerce was faced with imperfect information on the record and had to make a choice about what the proper information to use was, something that's in commerce's wheelhouse as an administrative agency. So let's address that. If the pack weight is different than the FOP weight, then is it all of a sudden commerce policy to just always go with the pack weight because the pack weight must be more accurate because we're so sensitive about safety concerns and shipping these products? No, but as the trial court in this case recognized, and this is at page 125 and 126 of the record, commerce was faced with imperfect information. There were two numbers. And commerce went with the number that was linked to what the trial court aptly termed real-world choices. And to step back a little bit, what happened here, because I don't think the record has been entirely accurate as articulated by the appellants, commerce received two numbers from C.S. Wynn. Commerce asked C.S. Wynn, what do these wind towers weigh at the end of the day? And C.S. Wynn reported a number. That number is what we call the pack weight. Commerce verified that number in C.S. Wynn's books and records as what they understand to be the pack weight of these products when they are shipped as part of verification. Commerce also reported, well, what are all the factors of production that you put into this product weigh? And C.S. Wynn reported the different weights of all those factors of production. And at the end of the day, those weights don't add up to what C.S. Wynn reported as its pack weight. And the difference is off by tons, literally tons. Tons out of a total of, what, like 170 tons? That's right. So, I mean, everything here is relative. Saying it's tons makes it sound large. In fact, as a percentage, it's really, really small. It's not that small, Your Honor, respectfully. 3.6% of the total weight. And it seems to me you rightly understand in your brief, because you repeat it, you say it two times, you stress how it's a doubling of the weight, and so that must be significant. I don't see anywhere that Commerce said a 3.6% difference in the weight is significant enough to the safety of the ship that we therefore will believe the higher number, because it's more likely accurate. Well, Your Honor, I think that explanation is at page 57 and 58 of the record in Commerce's Issues and Decision Memorandum. Look, it is a five-digit figure, and one wouldn't expect, if there's going to be a difference in the weights, that it would be the entire weight of the wind tower. That would be extreme. On the other hand, what these packed weights are are not just guesstimates. They're calculations of center of gravity measurements that are, according to C.S. Wynn, calculated by a sophisticated engineering company and are in the interest. I thought it was agreed that, well, maybe these aren't guesstimates, they are estimates. And so Commerce at page 57 and 58 of the record indicated that, while we might not expect it to be exact, we think that these should be sufficiently similar not to create a problem. The implication of that is obviously that they're not sufficiently similar. And on the other hand, Commerce said we don't think these should be grossly overestimated in a way to risk the potential rolling of the towers or safety of the vessel. And so Commerce is indicating there that, look, and I want to be clear, we're not saying it's off by 100%. We understand that it's, previously that was a BPI number, but it's 3.7%, as it's been indicated in court today. We understand it's not, that it could be a larger number, but that was a sufficient discrepancy for Commerce to say, you know, this is an issue we've had, Commerce asked a number of times for CS Wind to explain what the discrepancy was, didn't get a satisfactory answer, and so at the end of the day, and this goes back to the trial court's decision, Commerce tied its determination to the real world choices. We said, we are going to use, Commerce said, we are going to use a number that is numbered at the end of the day when CS Wind and its client have to pack these things onto a ship and calculate the center of gravity sufficiently accurate so that these large wind towers are not going to roll on the ship. That's the number they use, not adding up all the FOP weights, and Commerce didn't assign blame here. It's not clear, you know, why these internals, I mean, the point is about the doubling. Is there any evidence in the record that the sensitivities for safety concerns of shipping are so severe that we need to have the pack weight be totally precise and accurate? Well, that's part of what Commerce learned in verification, and that's why we continually indicated that this issue came into focus at verification. No, I understand, but is there any evidence in the record that's showing that the pack weight absolutely is critical to, I don't know, a tenth of a percent accuracy or something like that? Sure, not in that way, but that's what Commerce indicated at page 835 of the record, and then it's in its decision memo at page 57 and 58. These issues came into focus because Commerce talked to the people at CS Wind and learned that these pack weight figures are actually pretty important and that they need to be reasonably accurate. And here, there was enough of a discrepancy that it wasn't, and the reason it's a doubling is because the discrepancy was actually tied to one particular set. But then maybe there's not really anything other than Commerce, you know, imagining the common sense that you'd want some safety tolerance in knowing the weight for shipping. I think it's more than that. What we sought to communicate and what's evident at 835 of the record and then through Commerce's decision is that in talking to CS Wind officials at verification, Commerce determined that the pack weight was actually a pretty important figure for these packing and shipping purposes. And so, while I don't think CS Wind provided a, you know, it has to be right within this percentage point, the number here, 3.7%, it's certainly not de minimis. I mean, frequently when we're in the dumping compact, we talk about de minimis being like .5 or less, right? De minimis dumping is .5 or less. This is seven or eight times that. It's not an overwhelming discrepancy, but it was enough for Commerce to say, you know, if we have to choose between these numbers, we don't know which one is right. And that's one more key point, by the way. This is at 802 of the record and as well, Jeff Rustani's decision again at 125, 126. When we say verified, Commerce didn't go and say, oh, this FOP weight number, these are all correct. These are the actual correct weights of what's in the tower. What Commerce is doing at verification is saying these are the numbers we reported. We reported we're looking at what's in your books to see if those are the same numbers in your books. And in fact, this is the part at 802 of the record, CS Wind was not producing wind towers the week when Commerce was there verifying. And Commerce noted, and then the trial court noted, that Commerce could not actually weigh these internal components to try to figure out what they actually weigh or what was off. So at the end of the day, Commerce made a decision that if we have to, we don't know what. Sure. We're running out of time here. Sure, sure, sure. My understanding is, you know, Commerce's policy is to try to just look at the face of one of these financial statements and not look behind the statement too much and then try to come up with a reasonable outcome. Then you came up with a formula here that is anything but straightforward. I mean, this formula is extreme and I don't understand it. And if it looks incoherent to me, then I get very worried. So let me try to simplify the issue. At the end of the day, there are two important pieces of evidence in those financial statements, at page 737 and 744. 737 is where it says the job work charges include civil and erection expenses. And both Commerce and the Trial Court have logically understood that that means that the civil and erection expenses are not the overwhelming portion of the job work, but are some subset of that. That's consistent with what's at page 744 of the record, which says that the production of steel structures and pipes is done on a job work basis. So these are big steel structures. If you're outsourcing a chunk of your steel structure work, that's going to generate a lot of expenses and job work. The implication of that is that the civil and erection expenses should not be all of the job work charges. It's job work including civil and erection, not civil and erection including job work. That's poor. Just to be clear, in your description of 737 and 744, you added words like predominant, overwhelming, largely something like that, which do not appear on those pages. No. It says job work including civil and erection. This document does not say. It could be, though one would assume that if CS, what CS Wynn's arguing here is that those civil and erection should be treated as if they're 98, 99 percent of the job work expenses. And just from the face of the statement, if they were functionally all of the job work expenses, then it seems unlikely, illogical, that the line item would be job work including civil and erection. I thought their basic position amounts to something on, I'm just doing a mental calculation, something on the order of 60, 65 percent of the job work charges. They want to take the 212, subtract out 142. My understanding is it's 98, 99 percent. Isn't their primary position, look at the income side. The income side on erection and civil is 90 plus, 90 and change, and 51 and change, it adds up to about 142, just offset that out of the 212. So that was their original position. That's what they say, but it's not just their original position. It's their primary position here. I'm just confused about that. I mean, that's not 98 percent. That's like 65 or something. I don't know. You're right, Your Honor. Largely in this case, we've argued about once Congress made the decision that it's appropriate not to include them both, but to exclude them both to comply with the Court's original order. C.S. Wynne has continually argued that if you're going to exclude them, you have to exclude them the same percentage-wise. Right. If you're indulging in assumptions here, is it really not? Tell me why it's not the fairest assumption that the erection and civil expenses are, in fact, for the same towers. They pay a subcontractor to set the things up. They pay the subcontractor. They then add a contractor markup and bill that to their customer. And therefore, they do really, in a real sensible world, in which Gansey's is not sending people to the mountains in West Virginia to set up the wind towers. It's getting local subcontractors. It's a kind of a pass-through. So why is not the most sensible assumption, to use your word, that these are, in fact, about the same work? And so you should offset the expense by subtracting the ______. Well, two reasons. Congress determined, if anything, they're not likely to be the same work. And that's, for example, page 160 and 161. That's the first remand determination. You can't tell. What's the basis for thinking that they're not likely? But these are broken-out ______. What's the basis for saying that they're not likely to be the same? So these are broken-out as a separate item on the income statement. There's sales, and then there's separate items for income from civil and income from reaction. And the notes to the income statement, this is at 740, indicate that they are done on a percentage of completion basis. And so that indicated to Commerce that this was a separate income line item that's not part of the general operations of the company. And Commerce, when you have something like that, does not treat the item as a general overhead. As Your Honor has repeatedly indicated, and as Commerce has repeatedly indicated, it can't go beyond the face of the income statement. But at the end of the day, when you have a separate line item that's done by percentage of completion method, indicating that we're constructing this and we're building this as we go along, the best indication was that this was a separate item. So Commerce, at the end of the day, determined it wasn't appropriate to include them both, but to exclude them both. And then it had to go through a process of estimating if the job work expenses include civil and reaction, what was an appropriate way to estimate that? And it went through a process with the court where it tied a number of the income items to things that would have been generated as a result of job work. And derived a ratio and then said if job work expenses are going to include civil and reaction expenses, we think this is an appropriate way to exclude a portion of that as accounting for civil and reaction. Because it's appropriate to exclude them both. At the end of the day, these type of technical accounting matters are really, really at the core. Right. And they also make all the difference. It's really easy to hide giant mistakes in the mystery of numerical technicalities. So that's why it's important that we actually understand the explanation. Understood. But I can say that by what's happened here, it's clear Commerce felt very, very strongly that it's not appropriate to include all these. So why are the job work income number, which is trivial beyond belief, why is that appropriate to include in this base? It can't possibly relate to the job work charges. Well, again, because it had the same name, that's kind of a problem for you, right, if that's what you follow. Because that's what their primary theory is, the other side. Same name, offset. Civil income, erection income. Well, and at the end of the day, that's why Commerce did not include either civil income or erection. Well, then why shouldn't they have included sales of job work, right? I'm sorry, they didn't include the civil and erection expense. I mean, what they ended up doing at the end of the day was excluding them both. But get back to Judge Perana's question. Why is sales of job work included in the denominator of this ratio? My understanding is that because those are both general expenses, job work expenses are kind of general overhead income, where you're, again, paying third parties to construct things for you. Right, which is a completely different task than the tasks involved in yielding sales of job work. Sales of job work income, right? They're the ones who are performing the outsourced work for somebody else in the income side as opposed to them. That's right. I think my understanding is that Commerce still treats that as a general expense. I'm sorry, a general income item. Whereas when you have civil and erection broken out and done on a kind of percentage of completion basis, which means we're getting paid, not in general because this is part of our general sale, but we're getting paid as we do this work. That's a separate item, separate business. It's not part of, hey, we're selling you wind towers. This is, you know, to take the reply brief, which I should add, cites a bunch of information in the record that they've had about six briefs to try to cite and only did someone reply. So there's no good answer on why sales of job work is included. Is that fair to say? Well, so I hope I have a good answer, so I'm going to try one last time. Sales of job work, Commerce considers to be kind of a general overhead income, similar to the expenses of job work, which are general overhead. Like Andrews makes when it does some kind of service for another company on another company's raw materials. That's right, and it's pretty minuscule. I mean, they don't seem to do a lot. It's minuscule, but it's there. It's there. On the other hand, the income from civil and erection, in addition to being broken out separately, when you look at it being accounted for on a percentage of completion basis, what you're seeing there is they're saying we're getting paid for doing this kind of, as we do this work for someone else, we're getting paid for it on a month-by-month basis, or whatever the percentage of completion is. So that seems to be truly a separate line of business. It's not about we're selling wind towers here. It's that we're doing other work for other people and getting paid for it. Can we talk about the ratio being applied to factor out certain income for the sales of finished goods so that we're left with what Commerce is looking for, which is the portion of the income from the sales of finished goods category that is correlated with and associated with the job work expense involved in creating that income? I didn't understand that ratio. About raw materials plus direct labor divided by raw materials plus direct labor plus overhead plus energy all of a sudden gets you some proportion of the income that relates to job work expense. It didn't make any sense to me. Sure, I can address that. By the nature of job work, you're talking about work that doesn't involve raw materials and direct labor. I guess another way of asking my question is why is it that overhead plus energy divided by all those costs necessarily tells us what's the percentage of the income from the sales of finished goods that correlates with job work expense? You're calculating the overall. Actually, as someone who knows a little bit of statistics and accounting enough to be dangerous but not who is an accountant, that made sense to me. What you're doing is you're calculating, and this is the kind of thing that Commerce does all the time, you're calculating the overall direct labor and energy costs. If you look at all the costs, the portion of their costs across the company that are direct labor and raw materials or whatever it is, 8% or 10% or whatever. That's their overall labor and direct costs for their work. Then they're saying we're applying that ratio to all these numbers so that we're taking out the percentage of income. What's the goal here? The goal here is to try to figure out which part of the income from the sales of finished goods relates back to the job work expense that was paid out. In order to get that sales of finished goods income, right? Well, I think it's more like an adjustment. That's why I said this is the kind of thing Commerce does all the time. I don't know what you mean by adjustment. I thought we're hunting for the income that's directly related to the job work expense so that we can do some fair offset between the two. No. Am I wrong? I think respectfully, yes, Your Honor. Okay. What Commerce said and the trial court agreed is that we're going to use these entire expenses. We can't try to say when you have finished goods that are produced in part based on job work and then you sell them and you make a certain amount of income. We can't say we're not going to try to break out what portion of that income is related to the job work portion of the work that's not appropriate and that's not really what Commerce's calculation was about. It's saying look, we're going to take everything that's income that stems from job work and estimate kind of a percentage of where the job work and civil interaction amount from that. What Commerce was doing with the raw materials and labor is saying look, we need to adjust this because one thing that we know isn't part of job work are raw materials and labor because job work is work that someone else is doing for you so you don't have to deal with the raw materials and labor. So we need to adjust these figures, the sales of finished goods figure, to account for the fact that really some of that is direct materials and labor because you are, when you're selling your own goods, you are expending direct materials and labor. And so that entails the calculation that I just spoke about a few moments ago where Commerce is saying okay, we're going to figure out across the company what your direct material and labor costs are as a percentage of your overall costs and then apply that to these figures so that we're adjusting the figure down so that... Right, but why does overhead plus energy somehow translate to being the job work expense proportion? Well, I think Commerce explained this in its decision. They probably explained it better than I'm going to here, but I'll take a shot at it. Let's assume they said something and I didn't understand it. Yeah, so... Take me to a better place. Well, what they said was that job work does include all these other types of things. It does include overhead and energy. I'm not an accountant, but I'll take for a given Commerce's determination that all those type of things are generally included in job work. It's just the raw materials and labor that are not... But who's overhead and who's energy? We're talking about a third party that's doing the service, right? No, here you're talking about Ganges. The reason that there's no direct labor and there's no energy is precisely because there's a third party doing the service. We're paying someone else to do it. I'm sorry, I said energy, direct labor and raw materials. So the reason that there's no labor and raw materials is precisely because you're paying someone else to do it. So on the job work side, you're going to have overhead... But because you're paying someone else to do it, none of your overhead and none of your energy is involved either, right? That's not my understanding. My understanding is that... And I don't think there's been an argument from CS Lin that those type of other things go into Ganges' work. What is missing from the job work is direct labor and raw materials. And so given that predicate, what you're doing is just... Now you're back when you're dealing with the sales of raw goods and the sales of scrap, you're back in Ganges' world where not just energy and overhead, but everything's included, including direct labor and raw materials. And so they're saying, look, we know that's not part of job work. So we have to make an adjustment to remove those items. We certainly have not had a dispute in this case to date that those type of other expenses would be present when you're dealing with... They are challenging the calculation of this factor that's being used in your formula, that you're multiplying against the sales of finished goods and the scrap and the EI and the CI. Well, if I understand them correctly, I think they're saying that you don't do it. You don't need to do it. Well, that's their primary argument, namely. Go back to their simple first thing. And then the second, the backup argument is, well, if you're going to start doing this ratio business rather than the simple offset of the income and the charges with the same name, then we've got a bunch of problems. And one of them is the application of this ratio, the raw materials direct labor ratio, to both the denominator and the numerator. The application to the numerator is actually not discussed, right, in the final redetermination. Is that right? It's not explained. Well, so my understanding is that CF's wind has not challenged the notion that other than raw materials and labor that these type of other things are expenses that would be associated across the board, whether it's job work or other type of work. They focus, as I understand it, on saying you're applying this labor and direct energy wrong because, I mean, it's complicated, but because we don't think that those should be subtracted from civil interaction. We think that actually that's part of civil interaction. And Commer said, no, no, they're not. I'm not sure how that plays through on the numerator and the denominator. Well, I think I'm remembering. Correct me if I'm wrong. In the final opinion from the Court of International Trade, there's a footnote that says the final redetermination decision by Commerce actually never explains, as though it obviously is applying the same ratio to the numerator as to the denominator. If it left the numerator alone, we would be a whole different ballgame here. The fact that he went from the initial redetermination to the final one that reduced the numerator by, I don't know, 90 percent or something, and the same with the denominator, if you left the numerator alone, it might not be here. I mean, it wouldn't be a complaint. So I assume Commerce just doesn't explain the application of that figure to the numerator. I assume your Honor is correct, although I confess I don't particularly know. But the point is they're saying, look, this stuff isn't part of job work. And so when we're using these other numbers, we can't have it be part of those numbers either. And so these two things, which are not part of job work, shouldn't be part of those other numbers. We're going to make an adjustment. I think where we had a bit of a disconnect is I don't think there's a... There certainly has been an argument in this case that would be appropriate for the Court to consider that other things that Commerce determined were part of job work and everything else actually aren't, like overhead and energy. So why apply the direct labor raw materials ratio to EI and CI? Why was that being done here? For the same reason that it was applied to the scrap and to the finished goods. Because if you're doing it, this is income from erection and civil activity. So if you're doing it, you're using your own labor and you're using your own raw materials, some portion of them, in that process. Whereas when it comes to job work, that's not. That's someone else's doing it. So why are we assuming that the same percentage is being done both with respect to finished goods sales and EI and CI? So I think this is pretty typical of Commerce's practice. I've been doing this a while. Commerce is taking the ratio across the company. And this comes up in other contexts when Commerce is talking about the cost of manufacturing or cost of production, all the type of calculations that show up this quarter when you have these kind of nitty gritty cases. Commerce calculated, as I understand it, across the company, in general, they're spending 10% of their costs on labor and raw materials and apply that ratio to the various figures, sales of goods, scrap, erection, and so on. I guess there's an assumption here that there's direct labor and raw materials being consumed in the effort to do the erection and civil activities, the setup activities in West Virginia? Sure. Yes, that's an assumption. It's a good assumption. The point is they're doing it if they're... Candies has a U.S. subsidiary or something with a unit of people out here doing the setups? Well, we don't know, but the point is it's on their side of the ledger. We're paying someone else, so all we do is pay for the product and we're not responsible for... No, but it would still be on that side of the ledger if they were doing a classic general contractor, subcontractor arrangement. They pay the subcontractor that's on the expense side. They do a little markup and they turn around and bill Siemens or the electric power company, whoever their customer is. It would appear on both sides even though they don't have any of their employees on site. Well, if it's income, if it's income, one would tend to assume that they're at least paying in part for the actual... for what goes into it because they're not paying for someone to come back to them with a product. They are responsible, whether they themselves... And look, the argument that CS1 has made on reply is that we do this ourselves. We won't just make you a wind tower. We'll build it for you too. We have no idea on record whether they work for subcontractors or not. But what they do is actually irrelevant, right? We're talking about Ganges. What Ganges... I'm sorry. That's right. And I was talking about Ganges the whole time. Oh, okay. You know, that's the big new argument that they've had on reply that this is an integrated producer and they're doing it themselves. But at the end of the day, Congress has said, on the income side, you're going to reflect some direct labor and raw materials because you're responsible for the... you're getting paid to do the production, whether they themselves or whether it's to a sub. On the expense side for job work, you're not. Or in general in job work, you're not. I know the court has been generous with time. I'm happy to respond to any other questions. Thank you, Your Honor. Hopefully, we'll hold you to your two minutes. Thank you, Your Honor, to make police the court. Robert T. Francesco on behalf of the Wind Tower Trade Coalition. I'd like to really only address one issue. Given my time, I wanted to go to the weight issue. What commerce normally does in its cases is it has to verify the weight of the factors of production that it's reporting. Its normal process is to compare that with the sale weight reported from the sales database, which in this case is the packed weight. CS Wind has asked commerce, their position is, that's an estimate. Just completely ignore it, leaving commerce no ability to verify whether that FOP, the weights in the FOP, is actually accurate. Now, Your Honor asked the question, is that estimate based on something? And the answer is yes. The estimates, they apparently base them on their own contemporaneous business documents that they generate. I'll walk you through a few documents here on the record. So, if you go to JA868, this is part of the verification exhibits that commerce collected. This is a document that CS Wind generates that identifies the total amounts of steel plate that are purchased. It has the gross weight at the bottom. Then it identifies what those weights of plate will be once they're cut into those tower shapes. The total weight that's at the bottom, it's proprietary, I can't go into it, but if you flip them over to the verification report at JA835, that gross weight ties exactly to the gross weight in the factors of production. If you then flip back over to JA868 and the weight of the cut steel plate at the bottom of that document and you flip over to the estimate that they provided commerce at JA592 and you total up the steel plate for the top section of the tower, the steel plate for the middle section of the tower, and the steel plate for the bottom section of the tower, that ties exactly. So these estimates are in fact based on something. Now, in that same document, if you look at the top section, the bottom section, the middle section, you'll see there's... Sir, are we still on 868? I'm sorry, JA592. You'll see that there's internal weights reported for the three sections. If you flip over and look at the verification report JA835 and you look at the internal weight reported there, it appears that they're missing two sections, two tower sections of weight. The internal components are what's really off here. If you total up the other components, the steel plate, the door frame, and flange, comparing JA592 with JA835, they're not off by much. In fact, they're very close. What's off are the internal components and they're off by a factor of four. So they appear to be missing something. And what commerce verified when they did the verification is that based on the internal components that were reported in the FOP, they randomly selected five and they confirmed that those five were, in fact, in there. That doesn't mean that the other internal components for the middle section and the top section, where did they go? If they were never reported, there's no means of commerce to determine that they were actually in there, which is why, again, they go back to the packed weight. And commerce said, the packed weight is clearly relevant. It's important. Your own customer generates this document for purposes of loading it on the ship. I can't just ignore it. So, based on that, commerce reasonably concluded that there does appear to be something missing here and it appears to be the internal components and they made that adjustment. Thank you. Sir, you're up. We'll give you five minutes if you need it. I assume I don't have much time. If I could spend two seconds on the argument that we didn't discuss and that is on the enemy inputs and the enemy inputs, they have... I'm sorry. I still, I guess, I have a question about the argument we were just discussing. Backwards. The packing. Yes. So, did commerce make its decision to rely on packing weight based on the magnitude of the difference, which in the government's brief it emphasizes as a doubling, or, and, or, did it rely on the kind of document comparison we just heard from 592 versus 835? Did commerce say there is a section or more than one section of the tower missing from their reports? The way we read the issues and decision memorandum, commerce's decision was based on the fact that there was a 3.6% difference in the total packed weight compared to the total weight when you add the actual weights that they verified and then they talked about the, you know, the balancing of the towers. So, the estimated weight meant something, but they did not do in the mission decision memorandum saying something was missing. They found... Except by inference, something... I don't even think they found it by inference. That's what petitioners would have liked commerce to say, but commerce didn't say that. Commerce's decision was based on the 4% difference between the estimated weight and the actual weights that they verified, and they verified the weights and they had the opportunity. They looked at 5, they could have looked at 10, they could have looked at 20. They did not find that anything was missing. They never said that anything was missing. They actually... When commerce came back to you and said, can you clarify why the packed weight number is different than the FOP weight number, and according to them, you didn't come back with any meaningful response. Our meaningful response was that the packed weight number was an estimate. We said it was given to us by our customer, it was an estimate, and there's going to be a difference. And commerce agreed that they recognized that there's going to be a difference. And then we go to commerce and we say, look, we have given you the actual internals, we've given you everything, everything that was in that wind tower, we've told you, you know, that nothing is missing, you can verify everything, you can verify what actually went into that wind tower, look at our books and records as to what went into that wind tower. And commerce says they do a verification, they spot you. And they verify the accuracy. If they wanted to go ahead and do additional verification as to the accuracy of our internals, we absolutely, we cooperated in verification, that was their choice as to how to verify those internal weights. And every weight that they did verify was accurate based on the documentation that we gave them. So it was off by 20 percent. And then they said, can you please clarify? And then you came back and said, it's just an estimate. What should be the outcome there? What should be, then I could see a real problem if the weight's off by 20 percent. But when you're talking about, you know, what we believe to be a small difference, a less than 4 percent difference, and they had the opportunity to verify, they didn't challenge the accuracy of the internal weights or the internal components which we gave them. They said it was accurate in their verification report, in their issues and decisions. Do you want to talk about Issue 3 in your last minute? Ganges? Or should I talk about the issue we didn't discuss? No, no, no. Issue 3. You don't want to? The Ganges issue. The Ganges issue, at the end of the day, we believe that the Congress decision was result-oriented. They made a decision at the beginning and they worked through hoops to get to the same decision at the end. We had a very difficult time understanding that issue. They made certain assumptions. And, you know, if you talk about, if you say their methodology is correct, which we believe it isn't, then their final methodology, when they had the erection, I'm trying to get in my mind here, they went from the expense side to get this 82% materials and labor. And then they apply it to the income side. And when they apply it to the income side, okay, for finished goods, they take out 82% for material labor. And then somehow they assume that for the erection and the civil income, you take out 82% materials and labor. I don't know where they get that from. You know, the erection and the civil expenses, who says there's materials and labor when you erect something? You know, you're erecting something. You're doing some civil expenses. We don't really know what it is, but it seems that they're making certain assumptions to get to a result through hoops that they want to get to. And they go through the expense side with the 82%. Then they apply the 82% to sale of finished goods and to the erection and the civil income. And it's supported by nothing. They're just making it up out of thin air. And the other thing that they did that we have a problem with, when they say the sale of finished goods somehow relates to job or income because they say for the income purposes, we take the sale of finished goods, the sale of scrap, and the civil and erection income, and they somehow say the sale of finished goods somehow relates to the civil income and the erection income. Well, the sale, as you pointed out before, the sale of finished goods has nothing to do with job or income. It's totally different. So they're making certain assumptions in a convoluted manner which they didn't have to make to have a reasonable result. And we believe that because they're going through all these hoops, the result can't be reasonable. It's just a mess. On that note, thank you, Your Honor. We thank all parties and the cases submitted.